Filed 10/4/21  In re K.G. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re K.G., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>Y.V.,<br><br>    Defendant and Appellant. | G060271<br><br>(Super. Ct. Nos. 18DP0544, 18DP0544A)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Antony C. Ufland, Judge.  Affirmed.

Jill Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\*       \*       \*

## INTRODUCTION

Y.V. (Mother) appeals from the order terminating her parental rights to her daughter, K.G., pursuant to Welfare and Institutions Code section 366.26, subdivision (b)(1)[1] and ordering adoption as the permanent plan. Mother argues the juvenile court erred by finding the parental-benefit exception (§ 366.26, subd. (c)(1)(B)(i)) did not apply and by denying her request for a bonding study.

We conclude the trial court did not err by finding the parental-benefit exception did not apply. K.G. is challenged by many serious physical, medical, and intellectual issues. She has cerebral palsy, autism, and a severe intellectual disability called Sjorgen-Larsson syndrome, among other issues. She is unable to form sentences or words and expresses her feelings and needs by making sounds or physical gestures such as smiling and pointing. K.G. is fortunate to have a caregiver who meets all of her needs, loves her, and wants to adopt her.

The juvenile court engaged in the correct assessment and concluded the benefit to K.G. of placement in a new, adoptive home outweighed the harm of losing her relationship with Mother. The court acted within its discretion by reaching this conclusion and ordering that adoption, the statutorily preferred plan, be the permanent plan for K.G. A bonding study was not required, and Mother had forfeited her claim that the juvenile court should have ordered one. We therefore affirm the order terminating parental rights.

---

[1] Undesignated code references are to the Welfare and Institutions Code.

2

# FACTS AND PROCEDURAL HISTORY

## I.

### The Dependency Petition

K.G. was the subject of a dependency petition filed in May 2018, when she was 11 years old. She was not detained at that time and remained in her parents' custody.

In a prior opinion, *Y.V. v. Superior Court* (Dec. 22, 2020, G059410) [nonpub. opn.], we explained events leading to the declaration that K.G. is a dependent child:

"In August 2018, the juvenile court sustained the dependency petition filed in May 2018 by the Orange County Social Services Agency (SSA) on behalf of [K.G.] (the petition), alleging she came within the jurisdiction of the juvenile court under section 300, subdivision (b)(1) (failure to protect). As of the jurisdiction hearing, [K.G.] was not detained. The following summarizes the allegations of the petition sustained by the juvenile court to which both Mother and M.G. (Father)[2] submitted.

"Mother and Father failed to ensure that [K.G.], who has been diagnosed with cerebral palsy, autism, developmental delays, and a speech impairment, has obtained timely and appropriate medical care and attended medical appointments with orthopedic, gastroenterology, ophthalmology, and urology specialists and obtained a renal ultrasound.[3] [K.G.] is a Regional Center client and has an Individual Education Plan.

"When Mother was questioned in May 2018, she confused her own medications with those belonging to [K.G.] and was unable to easily access information about [K.G.]'s doctor. [K.G.]'s teeth were in need of dental care.

---

[2] Father is K.G's alleged father but not K.G.'s biological father. Father is not a party to this appeal.

[3] K.G. has nystagmus, is near sighted, and suffers from hydronephrosis and left vesicoureteral reflux (urine flows from the bladder back into the left kidney).

"Mother and Father have a history of domestic violence. Mother's adult son reported that Mother and Father are 'always engaging in physical fights'; Mother accuses Father of cheating on her and hits him and sometimes Father hits back. Mother's adult son reported that Mother and Father fight in front of [K.G.] and on May 23, 2018, Mother slapped Father during an argument causing [K.G.] to cry. Father reported that Mother had hit him, but denied that he hit her.

"The petition alleged that Mother may have an undiagnosed and untreated mental health condition. Her adult son reported Mother says things that do not make sense and are not realistic. For example, Mother has stated she has an appointment with Donald Trump to get her passport. In November 2017, Mother went to a police station to ask that a letter be sent to the President of the United States requesting an investigation due to Mother being harassed and physically assaulted. 'At that time the [M]other claimed that she almost got food poisoning, [had] been run over by a car, and had a drink thrown at her in 2013, suspecting that people she used to live with tried to harm her.' On May 26, 2018, Mother was observed to have erratic behavior, scattered thoughts, and irrational ideas. Father reported that Mother is happy one moment and then suddenly starts screaming at him, accusing him of being with other women.

"Although Father is not [K.G.]'s biological father, he has treated her as if she were. The identity of [K.G.]'s biological father is unknown as is his ability to provide for her safety, protection, and support or to arrange for appropriate care for her.

"[¶] . . . [¶]

"Following the disposition hearing, in accordance with SSA's recommendations, in October 2018, the juvenile court declared [K.G.] a dependent child of the Orange County Juvenile Court under section 360, subdivision (d), and ordered that she remained placed with Mother and Father and that family maintenance services be provided to the family." (*Y.V. v. Superior Court, supra*, G059410, fn. omitted.)

4

Mother's case plan required Mother to: (1) comply with medical or psychological treatment; (2) demonstrate adequate knowledge of K.G.'s special needs; (3) demonstrate an ability to provide, or obtain any specialized care that K.G. required, such as medical, dental, and developmental services; (4) learn to care for K.G.'s individual needs and attend all specialty medical and developmental service appointments; (5) refrain from behaving in a manner that is verbally, emotionally, or physically abusive or threatening; (6) show an ability to provide adequate care for K.G.'s special needs; (7) inform the assigned social worker of any difficulties in completing the case plan as soon as they occur; (8) participate in individual, conjoint, family, and/or group therapy with a therapist approved by SSA to address domestic violence, K.G.'s special needs, and how to meet those needs; and (9) comply with a mental health evaluation to include attending mental health and/or psychiatric appointments. (*Y.V. v. Superior Court, supra*, G059410.)

## II.

## Removal of K.G. From Parents' Custody

In March 2019, SSA filed a protective custody warrant application and declaration for the removal of K.G. from Mother and Father's custody. The application alleged that Mother had failed to take K.G. to appointments for ophthalmology, orthopedics, a diagnostic ultrasound, physical and occupational therapy, and a hearing test. (*Y.V. v. Superior Court, supra*, G059410.) The application also described an incident in March 2019 in which K.G. suffered an injury to her right eye. While Mother claimed that K.G. had fallen and injured her eye, Mother's roommate said that K.G. had injured her eye by rubbing it with a sponge. The social worker was unable to determine the cause of K.G.'s injury "due to the child's inability to communicate verbally." (*Y.V. v. Superior Court, supra*, G059410.)

According to the application, Mother had complied with the juvenile court's order to submit to a forensic psychological evaluation by Dr. Roberto Flores de

5

Apodaca. He diagnosed Mother as having an "'Unspecified Psychotic Disorder'" and stated that Mother's diagnosis constituted "a significant risk factor for her well-being and ability to parent." Dr. Flores de Apodaca stated that it would be possible for mental health treatment to improve her psychosis. The application alleged that Mother had refused to seek mental health services because she did not believe she had a mental health issue. (*Y.V. v. Superior Court, supra*, G059410.)

The application requested that K.G. be removed from Mother and Father's custody "'[d]ue to the mother's unresolved mental health issues and lack of follow through with the child's medical appointments'" which placed K.G. "'a[t] substantial risk for further abuse or neglect.'" (*Y.V. v. Superior Court, supra*, G059410.)

The juvenile court granted the application and ordered that K.G. be detained. (*Y.V. v. Superior Court, supra*, G059410.) In March 2019, K.G. was placed in the home of Emma Z., where K.G. has remained.

**III.**

**SSA's Supplemental Petition**

In March 2019, SSA filed a supplemental petition seeking a more restrictive placement (the supplemental petition). (*Y.V. v. Superior Court, supra*, G059410.) The supplemental petition alleged that, despite receiving services since March 2018, Mother continued to fail to meet K.G.'s medical and developmental needs. (*Ibid.*) The supplemental petition alleged that in September 2018, Mother was assigned a case manager through K.G.'s health plan to assist her in managing K.G.'s various medical needs. (*Ibid.*) Mother's case was closed, however, because Mother did not return the case manager's telephone calls. (*Ibid.*) Mother blamed missing appointments on not having financial means or transportation; however, Mother had been provided a bus pass and information on how to use ACCESS transportation for K.G. (*Ibid.*)

The supplemental petition alleged: "'Competent medical opinion is that, [Mother], has not been following through with the medical recommendations for [K.G.],

and whether [Mother]'s actions are deliberate or due to a psychiatric condition, [Mother]'s actions have put [K.G.]'s health at risk.'" (*Y.V. v. Superior Court, supra*, G059410.)  The supplemental petition also alleged that Mother had been diagnosed with nonspecific psychotic disorder and, during her evaluation, reiterated several delusional and paranoid statements and stated she had refused to seek mental health treatment because she did not believe she had a mental health issue.  (*Ibid.*)  The supplemental petition further alleged that Mother had not complied with court-ordered drug testing and had failed to provide proof of attendance at 12-step meetings.  (*Ibid.*)

The juvenile court found the allegations of the supplemental petition to be true by a preponderance of the evidence and sustained it.  The court re-appointed Dr. Roberto Flores de Apodaca to complete an updated assessment of Mother.  (*Y.V. v. Superior Court, supra*, G059410.)

**IV.**

**SSA Reports Prepared for 12-Month Review Hearing**

In a status review report dated March 30, 2020 and addendum report No. 1 from May 2020, SSA recommended that the juvenile court order the continued provision of reunification services to Mother.  (*Y.V. v. Superior Court, supra*, G059410.)  In the former report, SSA asserted Mother's cooperation in the case plan had been minimal.  (*Ibid.*)  In addendum report No. 1, the social worker reported that Mother had had three or four telehealth services via video chatting with Jane Canseco, LSCP.  (*Ibid.*)  Canseco informed SSA that Mother had demonstrated little insight into the issues requiring SSA intervention.  (*Ibid.*)  Canseco stated Mother's lack of insight and distrust of SSA, the juvenile court, and the police were "'recurring themes impeding her progress.'"  Canseco stated Mother could make progress if she "'accept[s] [the] process instead of defending against it.'"  (*Ibid.*)

In addendum report No. 2, from June 2020, SSA changed its recommendation from continuing reunification services to terminating them and

7

scheduling a permanency hearing. In that report, the assigned social worker concluded that Mother's progress in counseling was "'not significant enough due to the mother continuing to display paranoid delusions and still lacking insight into her own mental health issues'" and that Mother continued to "'demonstrate[] poor judgment when relating to others.'" (*Y.V. v. Superior Court, supra*, G059410.) Mother continued to report having paranoid and delusional thoughts, had "'no insight into her own mental health needs,'" and had "'denied a need for mental health treatment to address these concerns.'" (*Ibid.*)

In addendum report No. 3, from August 2020, the assigned social worker reiterated SSA's recommendation to terminate reunification services and schedule a section 366.26 hearing. (*Y.V. v. Superior Court, supra*, G059410.)

## V.

### Contested 12-Month Review Hearing and
### Termination of Reunification Services

A contested 12-month review hearing was held in September 2020. The juvenile court admitted into evidence the March 30, 2020 status review report and the three addendum reports. The assigned social worker and Canseco testified. (*Y.V. v. Superior Court, supra*, G059410.)

The assigned social worker testified that Mother had completed two parenting programs and continued to attend individual counseling with Canseco. (*Y.V. v. Superior Court, supra*, G059410.) The social worker testified she referred Mother to community resources that offer mental health services and Mother contacted those resources. (*Ibid.*) The social worker testified that she did not believe K.G. could be safely returned to Mother's care within 18 months of the date she was removed from Mother's custody. (*Ibid.*)

Canseco testified that she saw in Mother "'symptomology of delusional thoughts'" but thought those symptoms would not interfere with her daily living

8

activities. (*Y.V. v. Superior Court, supra*, G059410.) Canseco was not directed to address symptoms of Mother's mental health diagnosis. (*Ibid.*) Mother had told Canseco the reason SSA was involved in her life was that she had failed to obtain proper dental treatment for K.G. and someone had made an anonymous call to report she had abused or neglected K.G. (*Ibid.*) Mother had not told Canseco of Mother's delusional thoughts. (*Ibid.*) Canseco disagreed with Dr. Flores de Apodaca's conclusion that Mother met the diagnostic criteria for psychosis not otherwise specified. (*Ibid.*)

The juvenile court found by a preponderance of the evidence that return of K.G. to Mother and Father's custody would create a substantial risk of detriment to K.G.'s safety, protection, or physical or emotional well-being. (*Y.V. v. Superior Court, supra*, G059410.) The court found that reasonable services had been offered to Mother and Father and that Mother's progress towards alleviating or mitigating the causes necessitating placement had been minimal. (*Ibid.*) The court ordered reunification services terminated for Mother and Father and set the matter for a section 366.26 hearing. (*Ibid.*)

At the end of the hearing, after the juvenile court had made its ruling, Mother's counsel requested that the court order a bonding study. The court denied the request.

Mother brought a petition for writ of mandate to challenge the juvenile court's order terminating reunification services and setting a section 366.26 hearing. In the petition for writ of mandate, Mother did not challenge the denial of her request for a bonding study. In *Y.V. v. Superior Court, supra*, G059410, we denied Mother's writ petition.

**VI.**

**SSA Reports Prepared for Section 366.26 Hearing**

In advance of the section 366.26 hearing, SSA prepared and submitted three reports: (1) Section 366.26 report dated January 7, 2021 (the January 2021 Report);

9

(2) Addendum Report No. 1 dated March 24, 2021 (the March 2021 Report); and

(3) Addendum Report No. 2 dated May 6, 2021 (the May 2021 Report). SSA

recommended that parental rights be terminated and K.G. be referred for adoption.

We summarize the reports by topic.

A.

*Placement and Adoptability*

K.G., who was then 14 years old, remained placed in the home of Emma Z., who wished to adopt her. SSA reported: "[Emma Z.] has had placement of [K.G.] since March 27, 2019. She has grown fond of the child, has taken her to her medical, specialty and dental appointments to ensure her medical, dental, and developmental needs are met. [K.G.] has maintained stable and suitable placement. . . [Emma Z.] desires to adopt [K.G.] [Emma Z.] appears willing and capable of providing a stable and environment for [K.G.]"

Emma Z. previously adopted two other, nonrelated, children through SSA and the Orange County Juvenile Court, and is committed to providing K.G. a permanent home and the best possible care. SSA determined that Emma Z. is an experienced parent and "has demonstrated the ability to meet the child's needs by providing a safe and secure home, exercising proper care of the child to the best of [Emma Z.'s] ability." SSA concluded: "[K.G.] has sustained suitable and stable placement [with Emma Z.] [Emma Z.] has grown to love the child, and has followed up with her medical, dental, specialty, physical/occupational therapy appointments to make sure her medical, dental, and developmental needs are being met. [Emma Z.] has also ensured the child attends school regularly."

K.G. was described as "sweet, friendly, happy, and social" and was "affectionate and comfortable" with Emma Z. K.G. was considered difficult to place for adoption due to her age and medical issues, but was considered to be specifically adoptable. K.G. appeared to be "comfortable and safe" with Emma Z. and did not

hesitate to follow Emma Z.'s instructions. K.G. was not able to provide a statement concerning placement and prospective adoption or guardianship due to her developmental delays and limited communication skills.

## B.

### *Visitation*

The January 2021 Report, the March 2021 Report, and the May 2021 Report covered visitation since K.G. was placed with Emma Z. Since K.G.'s placement with Emma Z., Mother visited K.G. regularly and consistently. Mother visited K.G. three times per week, for a total of eight hours. Mother was appropriate and positive, and K.G. was described as having "a positive relationship with the mother." At a few visits, there were concerns that Mother did not properly discipline K.G. and made an unfounded accusation against SSA.

At visits, Mother would engage K.G. and bring food, games, dolls, coloring books, and balls. Mother would tell K.G. she loves her and demonstrated affection by hugging K.G. and kissing her on the cheek. K.G. sometimes returned Mother's affection and sometimes refused it. At a few visits, K.G. wanted to a watch a show on Mother's telephone and refused to interact with Mother. At one visit, Mother was noted to be overly critical. When K.G. was not playing on the phone, she sat with Mother and hugged her.

During the COVID-19 pandemic, Mother's visitation was restricted to video chats. The visits were described as "appropriate and positive." During the video visits, Mother played games with K.G., sang to her, showed her books, and played peekaboo. Mother showed K.G. affection by blowing her kisses and saying she loves her.

Mother's in-person visits did not resume until April 5, 2021 because the SSA provider that transports K.G. to visits did not have staff to transport her. Mother visited K.G. once a week. Mother interacted and engaged with K.G. Mother would bring

11

K.G. food, dolls, and crayons and a notebook.  Visits were positive, and K.G. would show affection toward Mother by hugging her.

The day after in-person visits resumed, Mother contacted the assigned social worker and claimed K.G. had a painful mass near her genitals.  Emma Z., the visitation monitor, a consulting physician, and a nurse at K.G.'s school saw no evidence of any such mass.  At a later visit, Mother again contended that K.G. had a mass in her genital area.  At another visit, Mother told the visitation monitor that a friend was coming to look at a scratch on K.G.'s cheek.  The monitor told Mother that was not allowed.

C.

*Mother's Mental Health Issues*

Mother continued to display "paranoid thoughts" and poor judgment.  SSA concluded that Mother had not significantly addressed her mental health issues, and Mother's mental health continued to be a concern.

**VII.**

**Section 366.26 Hearing**

The section 366.26 hearing was conducted on May 6 and 11, 2021.  The juvenile court received into evidence the January 2021 Report, the March 2021 Report, and the May 2021 Report.  Mother and the assigned social worker, Guadalupe Parada, testified.

A.

*Parada's Testimony*

Parada testified as follows:

Mother consistently had attended in-person and video visits with K.G. and, for the most part, had tried to be involved in K.G.'s day-to-day activities.  Parada believed that K.G. appeared to have a positive relationship with Mother.  During both video and in-person visits, Mother played peekaboo with K.G., showed her pictures of a

12

pet dog, and got her to scribble on a notebook. Parada described those activities as positive and having "drawn the child's interest."

Parada considers a dependent child's wishes when making a recommendation at a permanency hearing. Parada had not asked K.G. how she felt about adoption because K.G. has developmental delays and poor communication skills. Parada had not tried to gauge how K.G. felt about adoption and did not know how K.G. felt about the prospect of never seeing Mother again.

In recommending termination of parental rights, Parada had weighed K.G.'s bond with Mother against the benefits to K.G. of adoption. Parada believed it was important for K.G. to have "stability and consistency with the routine activities." Visitation with Mother was part of K.G.'s weekly routine.

Parada recommended adoption over guardianship because: "The child is adoptable, even though she's already over the age of seven. We have her current caregiver that is interested in adopting her. She's been caring for her ever since she got placed with her and has grown very fond of her, accepting her as family."

B.

*Mother's Testimony*

Mother testified as follows:

When in-person visits resumed, K.G. was very happy to see Mother and would run to Mother and hug her. K.G. sat on Mother's lap. They painted or colored together. Throughout the visit, K.G. hugged and kissed Mother and did not want to get off of her lap. Mother and K.G. read and sang together. During the next visit, K.G. used crayons to write her name and words. Mother and K.G. played and sang together. K.G. continually hugged and kissed Mother and wanted Mother to lull her to sleep. During visits, Mother helped K.G. use the toilet. Mother knew that K.G. was sad when the visit ended because, when in the car to leave, she dropped her head and placed her hand by her face.

13

Before in-person visits resumed, Mother had visited K.G. by video three times each week. During these visits, Mother and K.G. would play, although sometimes it was hard to engage K.G. because she would turn off the camera and not pay attention. To try to keep K.G. engaged, Mother would write notes to her. Mother also read to K.G. and wrote her name for her.

Between the first day and second day of the permanency hearing, Mother had an in-person visit with K.G. Mother held K.G. while she sat in Mother's lap. K.G. hugged and kissed Mother.

Mother understands that K.G. has cerebral palsy, autism, and communication issues. Mother was virtually present for K.G.'s occupational therapy sessions. Mother has tried to implement the techniques she learned during K.G's therapy sessions. Mother has maintained communication with K.G.'s teachers and has tried to implement techniques she learned from them. These techniques included writing words and having K.G. try to say them.

Mother attended the majority of K.G.'s medical appointments. Mother attended appointments "[t]o be on top of things regarding her doctors, what they recommend for her" and "[t]o be up-to-date of what she's going to need."

Mother disagreed with the recommendation to terminate parental rights because "my child has been living with me for all those 12 years and she needs my love, my understanding."

## C.

### *The Juvenile Court's Ruling*

The juvenile court ordered parental rights terminated as to both Mother and Father with adoption as the permanent plan. The court found that K.G. was specifically adoptable.

The juvenile court considered the exception to adoption under section 366.26, subdivision (c)(1)(B)(ii), which permits the court to find termination of parental

14

rights detrimental to a child 12 years of age or older if the child objects to termination of parental rights. The juvenile court found that exception to be inapplicable because K.G. had not objected to adoption.

In addressing the parental-benefit exception, the juvenile court described the case as "difficult" and "heartbreaking." The court found the Mother had had "regular and consistent visitation" with K.G. and, although Mother and K.G. had a "relationship," it did not rise to the level of a parent-child relationship. The court also found that even if Mother and K.G. did have a parent-child relationship, the harm from terminating parental rights would not outweigh the benefit to K.G. of adoption.

## DISCUSSION

### I.

### Relevant Law: Parental-benefit Exception

"If the court cannot safely return a dependent child to a parent's custody within statutory time limits, the court must set a hearing under section 366.26." (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) At a section 366.26 hearing, the juvenile court selects and implements a permanent plan of placement. (*Ibid.*) Termination of parental rights and adoption is the preferred plan. (§ 366.26, subd. (b)(1); *In re Christopher L.* (2006) 143 Cal.App.4th 1326, 1336.)

The juvenile court must first determine by clear and convincing evidence whether the child is likely to be adopted. (§ 366.26, subd. (c)(1); see *Caden C., supra*, 11 Cal.5th at p. 630.) If the court finds the child is likely to be adopted and there has been a previous determination that reunification services be terminated, then the court must terminate parental rights and order the child be placed for adoption, unless at least one of several statutory exceptions applies. (§ 366.26, subd. (c)(1); *Caden C., supra*, at pp. 630-631.)

Under the parental-benefit exception, the juvenile court may not terminate parental rights if "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) To establish the parental-benefit exception, the parent must prove three elements: "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*Caden C., supra*, 11 Cal.5th at p. 631, italics omitted.) In determining whether termination of parental rights would be detrimental to the child, the juvenile court must "decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Id*. at p. 632.) "By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Ibid.*)

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' [Citation.] Visits and contact 'continue[] or develop[] a significant, positive, emotional attachment from child to parent.'" (*Caden C., supra*, 11 Cal.5th at p. 632.)

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).) Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.] . . . [C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.] Doing so properly focuses the inquiry on

16

the child, even as courts must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Caden C., supra*, 11 Cal.5th at p. 632.)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption. (§ 366.26, subd. (c)(1)(B); see also § 366.26, subd. (c)(1)(D).) Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citation.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C., supra*, 11 Cal.5th at p. 633.)

"In each case, then, the court acts in the child's best interest in a specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' [Citation.] 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights. [Citation.] That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.] When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent. (§ 366.26, subd. (c)(1)(B)(i), italics added.)" (*Caden C., supra*, 11 Cal.5th at pp. 633-634.)

## II.

### The Juvenile Court Did Not Err by Concluding the Benefit of Adoption Outweighed any Benefit from Continuing the Parent Child Relationship.

All parties and the juvenile court agreed that Mother had satisfied the first element of the parental-benefit exception—regular visitation and contact.  The record establishes that Mother had regular and consistent visitation with K.G. to the extent permitted by court order and limitations created by the COVID-19 pandemic.  As to the second element, the juvenile court found that Mother and K.G. did have a relationship, but it did not arise to the level of parent-child relationship.[4]  We do not need to address whether this finding is supported by substantial evidence (see *Caden C., supra*, 11 Cal.5th at p. 639) because the juvenile court correctly concluded that, even if Mother and K.G. had a parent-child bond, the benefit to K.G. of a permanent, stable home outweighed any harm she might suffer from terminating her relationship with Mother.

### A.

#### *Standard of Review*

In *Caden C.*, the Supreme Court concluded a juvenile court's determination on the third element of the parental-benefit exception is reviewed under two standards.  The court's factual determinations underlying this decision are reviewed under the substantial evidence standard.  (*Caden C., supra*, 11 Cal.5th at p. 640.)  The court's weighing of benefit and detriment is reviewed for abuse of discretion:  "[T]he court must also engage in a delicate balancing of these determinations as part of assessing the likely course of a future situation that's inherently uncertain.  The decision is not the same as a

---

[4]  To establish the second element of the parental-benefit exception, the parent need not prove a parent-child relationship but "a *relationship*, the continuation of which would *benefit* the child." (*Caden C., supra*, 11 Cal.5th at p. 631.)  Any error by the juvenile court was harmless, however, because, assuming Mother proved a beneficial relationship, the juvenile court did not err by concluding the benefit to K.G. of adoption outweighed the benefit of that relationship.

determination whether to transfer the child from the custody of one caregiver to another, but it does require assessing what the child's life would be like in an adoptive home without the parent in his life. [Citation.] The court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid.*)

B.

*The Juvenile Court Properly Balanced the Benefit to K.G. of Placement in an Adoptive Home Against the Harm She Might Experience from the Loss of Her Relationship with Mother*

The juvenile court engaged in the requisite "delicate balancing" (*Caden C., supra*, 11 Cal.5th at p. 640) and concluded the benefit to K.G. of adoption outweighed the loss of her relationship with Mother. The benefit to K.G. of being adopted by a loving and capable caregiver, such as Emma Z., cannot be overstated. K.G. has many physical, developmental, intellectual, and medical challenges. It is a daunting task to meet those needs while at the same time providing K.G. love and emotional support. For over two years, Emma Z. has proven her ability and commitment to provide K.G. the care she needs and is poised to offer her the permanence and stability she requires.

Guardianship cannot guarantee that K.G. will receive the permanent and stable home she needs for her proper care. Guardianship typically ends when the child turns 18 and, before that time, guardians can be replaced and guardianships terminated. (See Cal. Rules of Court, rule 5.740(d); Judicial Council Form JV-350-INFO (rev. Sept. 1, 2019), p. 3.) The risk that K.G. might be moved between guardians or would lose the care of a guardian when she turns 18 is not acceptable: In contrast to guardianship, "[a]n adoption is intended to last forever." (Judicial Council Form JV-350-INFO, *supra*, at p. 3.) K.G. should have the life-long relationship offered by adoption. Her multitude of

challenges, and the level of dedicated care they demand, make adoption not just preferred, but necessary.

We assume that Mother and K.G. had a beneficial relationship. The evidence showed that Mother sincerely loves K.G., their visits were positive, and they often displayed signs of mutual affection. For the first 12 of her 14 years of life, K.G. was in Mother's custody. These facts are likely why the juvenile court described this case as "difficult" and "heartbreaking." But the juvenile court acted within its discretion by concluding the loss of whatever benefit a relationship with Mother might have for K.G. is outweighed by the benefit to her of placement in an adoptive home.

Before terminating parental rights, the juvenile court must consider the child's wishes, to the extent that they can be ascertained. (§ 366.26, subd. (h)(1); *In re Christopher L., supra*, 143 Cal.App.4th at p. 1334; *In re Leo M.* (1993) 19 Cal.App.4th 1583, 1591.) Here, the juvenile court found it would be "extremely difficult, impossible" to learn of K.G.'s wishes and whether K.G. objected to adoption. The record fully supports this finding. K.G.'s developmental and intellectual disabilities and limited ability to communicate are well documented. The SSA reports consistently state that "[K.G.] is not able to provide a statement concerning placement and the prospective adoption/legal guardianship due to her developmental delay and very limited communication skills."

A direct statement of the child's wishes is not required in order to reach a decision under section 366.26. (*In re Leo M., supra*, 19 Cal.App.4th at p. 1592.) At the section 366.26 hearing, Mother's counsel argued "we can't get a direct statement from [K.G.] She's not going to be able to articulate verbally I want an adoption, but we can definitely infer . . . that she would object if she could." But we draw all reasonable inferences in support of the juvenile court's order (*In re Megan S.* (2002) 104 Cal.App.4th 247, 250-251), and a reasonable inference from the record is that K.G.

20

would want a permanent and stable home with a caregiver who can meet her physical, intellectual, and emotional needs.

## III.

### Mother Forfeited Her Claim that the Juvenile Court Should Have Ordered a Bonding Study

Mother argues the juvenile court erred by not granting her request for a bonding study. "Trial courts should seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony." (*Caden C., supra*, 11 Cal.5th at p. 633, fn. 4.)

Mother did not request a bonding study until the very end of the 12-month review hearing. The juvenile court denied that request, and "[t]he denial of a belated request for [a bonding] study is fully consistent with the scheme of the dependency statutes, and with due process." (*In re Richard C.* (1998) 68 Cal.App.4th 1191, 1197.) Mother forfeited a claim of error by not challenging the denial of her request for a bonding study in her earlier petition for writ of mandate. (See §366.26, subd. (*l*)(1); *In re Tabitha W.* (2006) 143 Cal.App.4th 811, 816 [all orders made contemporaneously with the order setting a section 366.26 hearing must be challenged by writ petition]; *In re Merrick V.* (2004) 122 Cal.App.4th 235, 247 ["All court orders, regardless of their nature, made at a hearing in which a section 366.26 permanency planning hearing is set must be challenged by a petition for extraordinary writ"].)

Mother did not renew her request for a bonding study at the section 366.26 hearing. Although, in closing argument, her counsel mentioned the prior denial of the request for a bonding study, counsel did not renew that request.

The juvenile court was not required to order a bonding study. "There is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to a termination order." (*In re Lorenzo C.* (1997) 54 Cal.App.4th

21

1330, 1339; accord, *In re S.R.* (2009) 173 Cal.App.4th 864, 871 ["a bonding study is not statutorily mandated in a dependency proceeding"].)

**DISPOSITION**

The order terminating parental rights is affirmed.


FYBEL, J.

WE CONCUR:


MOORE, ACTING P. J.


ZELON, J.*

*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.